United States District Court
District of Connecticut
FILED AT NEW HAVEN

August 16, 20 23

By  S. Santos
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| In the Matter of the Tracking of a Red 2021 Chevrolet Blazer Bearing Connecticut License Plate Number AR65710 and VIN 3GNKBKRS2MS5862 | Case No. 3:23-MJ-721 (MEG) <br><br> **FILED UNDER SEAL** <br><br> August 16, 2023 |

APPLICATION AND AFFIDAVIT
IN SUPPORT OF A SEARCH WARRANT

Kyle A. Savo, being duly sworn, deposes and states as follows:

INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117 to authorize the installation and monitoring of a tracking device on a red 2021 Chevrolet Blazer bearing license plate number AR65710 and vehicle identification number 3GNKBKRS2MS5862 ("the SUBJECT VEHICLE"). Based on the facts set forth in this affidavit, I believe that the SUBJECT VEHICLE is presently being used in furtherance of violations of 21 U.S.C. §§ 841(a)(1) and 846 and that there is probable cause to believe that the installation of a tracking device on the SUBJECT VEHICLE and use of the tracking device will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

2. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for federal felony offenses. I am currently employed by the East Haven Police Department ("EHPD") in

the State of Connecticut, and have been since October 16, 2017. Prior to that, I was a police officer for the West Haven Police Department for approximately three years. I have been assigned to the Drug Enforcement Administration ("DEA") as a Task Force Officer ("TFO") since July 1, 2020. During my tenure as a police officer and Task Force Officer, I have participated in numerous criminal investigations, including investigations into suspected narcotics trafficking. I am currently assigned to the New Haven District Office, Organized Crime Drug Enforcement Task Force, ("Task Force") which is composed of personnel from the DEA, United State Marshal Service, New Haven Police Department, West Haven Police Department, Branford Police Department, Shelton Police Department, Meriden Police Department, Ansonia Police Department, Middletown Police Department, Naugatuck Police Department, and Waterbury Police Department. During my time as a police officer, I have made sworn applications for numerous arrest and search warrants, and have participated in the execution of many such warrants.

   3.  I have received instruction relative to conducting drug investigations while attending the Connecticut Police Academy in Meriden, Connecticut, as well as other training classes relative to narcotics trafficking. Over the past nine years in law enforcement, I have participated in the execution of numerous seizure warrants which have resulted in the seizure of narcotics, United States currency, assets acquired with drug proceeds and assets utilized to facilitate drug activities.

   4.  I have participated in numerous investigations involving individuals suspected of distributing illegal drugs, participated in controlled purchases of illegal drugs utilizing cooperating witnesses, confidential sources and undercover agents/officers, and obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs. Moreover, I have conducted physical surveillance of

individuals involved in illegal drug distribution, analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants and subjects, as well as other local, state and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. In the course of my duties, I have assisted state prosecutors prepare affidavits in support of applications for search warrants and arrest warrants, and have executed numerous search and arrest warrants. I have supervised the activities of cooperating witnesses who have provided information and assistance in state prosecution of drug offenders. As a result of my training and experience, I am familiar with the manners in which controlled substances are commonly brought to Connecticut, manufactured, processed, packaged and distributed. I know the relative wholesale and retail value of various types of controlled substances. I am familiar with behaviors, methods and common practices of persons and organizations that illegally transport and distribute controlled substances, as well as the devices commonly utilized by them.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. As part of my duties, I am currently participating in an investigation into suspected narcotics trafficking, in violation of 21 U.S.C. §§ 841(a)(1) and 846, involving the WILSON GUZMAN, JR. (the "TARGET"), and others, including others whose identities are unknown. I am familiar with the facts and circumstances of the aforementioned investigation as a result of my personal participation in the investigation; from discussions with agents of the DEA and other law enforcement personnel; from information provided by witnesses

involved in the investigation; and from my review of records, reports and affidavits relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, I heard the statement, or the information was provided by another law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. The information contained in this affidavit is based on this familiarity, and upon information which I have reviewed and determined to be accurate and reliable. Since this affidavit is being submitted for the limited purpose of the aforementioned authorizations, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the foundation necessary to support the issuance of the requested court order.

## PROBABLE CAUSE

7.      During the month of March 2022, I received a narcotics complaint about the TARGET from the Deputy Chief of the EHPD. The Deputy Chief advised me that he was receiving complaints from the owner of a local food market in East Haven. Specifically, the owner of the food market reported that a male had been conducting many hand-to-hand transactions in the parking lot of his business. The owner further stated that the male conducting the hand-to-hand transactions is operating a newer model red Chevrolet Blazer bearing Connecticut license plate number AR65710. A COLLECT/NCIC[1] check found that the vehicle is registered and leased to the TARGET at an address that is known to me in East

---

[1] COLLECT stands for Connecticut On-Line Law Enforcement Communications Teleprocessing, and NCIC stands for National Crime Information Center. Both are databases capable of accessing records maintained by various state and federal agencies, such as records pertaining to an individual's criminal history, wanted status, and motor vehicle licensure status.

Haven (the "East Haven Address"). During the month of April 2022, I conducted surveillance at the East Haven Address. I observed both the SUBJECT VEHICLE in the driveway of the residence and the TARGET at the residence.

8. On August 14, 2022, I received information from United States Postal Inspection Services (USPIS) TFO Andrew Tomer that the USPIS had received a narcotics complaint about two individuals working together and selling and shipping large amounts of marijuana and marijuana derivatives from their residence in East Haven. Specifically, the complainant explained that an individual, whose identity is known to me and who shall be referred to in this affidavit as Individual-1, is living with the TARGET, who is his friend. The TARGET and Individual-1 are shipping and receiving marijuana and mushrooms using the mobile app "Telegram,"[2] under the channel "SPITFIRE / TRAPPR KEEPRZ NEW ENGLAND." Customers can order marijuana and mushrooms on the Telegram app. The complainant has seen marijuana at the East Haven Address in the past but does not know if the TARGET and Individual-1 are still receiving products at that location. The complainant believes there may be a storage facility involved with the illegal activity. According to the complainant, Individual-1 drives a black Buick and that the TARGET drives a Ducati Motorcycle and a red Chevrolet Blazer. A COLLECT/NCIC check of the TARGET revealed that the TARGET has, in fact, registered a Ducati motorcycle with Connecticut registration and a red Chevrolet Blazer bearing Connecticut license plate number AR65710 (that is, the SUBJECT VEHICLE).

9. Since August 2022, members of the DEA New Haven District Office (NHDO) have followed the TARGET and his drug trafficking organization (DTO) through its Telegram

---

[2] Telegram is an encrypted cloud-based messaging service. In addition to privately messaging other users, users can create chat rooms, groups, and channels that allow them to communicate to multiple users at a given time.

channel name, "SPITFIRE / TRAPPR KEEPRZ NEW ENGLAND." During the course of this investigation, investigators have learned that "SPITFIRE / TRAPPR KEEPRZ NEW ENGLAND" also has a second channel linked to the account called "The Secret Menu." Through law enforcement observation, we determined that "The Secret Menu" advertises and sells additional narcotics, such as cocaine, Adderall, Oxycodone, and MDMA.

10. During the month of June 2023, members of the DEA NHDO opened an undercover Bank of America bank account to conduct controlled purchases from the TARGET through the Telegram app. DEA Special Agent Carlos Penagos acted in an undercover capacity as the customer during those transactions and shall be referred to herein as UC1.

11. In total, case agents were able to successfully conduct three controlled purchases from the TARGET via Telegram. The first two times, case agents purchased and obtained counterfeit Adderall pills, which tested presumptively positive for methamphetamine, and counterfeit Oxycodone M30 pills, which tested presumptively positive for fentanyl. Members of the NHDO received the narcotics in the mail at a shipping address provided by UC1. For the third controlled purchase, the TARGET met with undercover officers in person and sold psilocybin mushrooms[3] and a mushroom-laced candy bar. During that sale, the TARGET was observed using the SUBJECT VEHICLE.

12. During the course of the investigation, through physical surveillance, controlled narcotics purchases, discussions with individuals with first-hand knowledge of the TARGET's operation, and open-source database queries, investigators have learned a great deal about the TARGET's drug trafficking operation. For example, through physical surveillance and utility records, investigators have learned that, as of at least May 2023, the TARGET no longer

---

[3] Psilocybin is a Schedule I controlled substance under the Controlled Substances Act.

resides at the East Haven Address but instead at 25 Avalon Drive in Milford (the "Milford Address"). The Milford Address is a higher-end apartment complex with multiple units and includes a private community pool, gym, and dog park. Investigators have seen the TARGET come and go from the Milford Address numerous times, including before drug transactions. Public utilities at that the Milford Address are in the name of the TARGET.

13. Investigators have also learned about the TARGET's method of transportation. For several months, from April 2022 until August 8, 2023, the TARGET solely operated the SUBJECT VEHICLE. Recently, and as described in more detail below, the TARGET has used the SUBJECT VEHICLE to conduct drug transactions.

14. On July 12, 2023, the "SPITFIRE / TRAPPR KEEPRZ NEW ENGLAND" channel posted that a large shipment had arrived. On the basis of that information, the following day, July 13, 2023, at approximately 9:15 A.M., members of the NHDO established surveillance of the TARGET at the Milford Address. At approximately 9:20 A.M,, TFO Tom McGarvey located the SUBJECT VEHICLE parked in the complex of the Milford Address. The SUBJECT VEHICLE was parked near the entrance to multiple units, one being unit 2324, which is suspected to belong to the TARGET (the "Target Unit").

15. At approximately 1:00 P.M., TFO McGarvey observed the TARGET exit the common door for the Milford Address, specifically, the door that included the Target Unit. The TARGET walked to the community mailbox outside of the Milford Address, placed a small white bag of trash to the left of the common entrance for the Milford Address, and returned inside the residence. At approximately 1:46 P.M., TFO McGarvey observed the TARGET exit the Milford Address through the door that includes the Target Unit. The TARGET walked towards the SUBJECT VEHICLE and entered it. A short time later, the TARGET drove the SUBJECT VEHICLE out of the apartment complex.

16. As he drove the SUBJECT VEHICLE, the TARGET was followed from the apartment complex by case agents conducting surveillance. Anticipating that the TARGET would stop at a suspected stash location located at an address in West Haven that is known to me and shall be referred to in this affidavit as the West Haven Stash House, TFO Shawn Mendenhall positioned himself in the area.

17. At approximately 2:28 P.M., TFO Mendenhall observed the TARGET park the SUBJECT VEHICLE in front of the West Haven Stash House. The TARGET has been observed at the West Haven Stash House on numerous occasions and at times has been seen carrying USPS boxes from the main entrance to his vehicle. Additionally, "SPITFIRE_CT," the user account that operates the "SPITFIRE / TRAPPR KEEPRZ NEW ENGLAND" account, has posted "shops open" at the same time that the SUBJECT VEHICLE has been observed at the West Haven Stash House.

18. The TARGET remained inside the SUBJECT VEHICLE for approximately 12 minutes. At approximately 2:40 P.M., TFO Mendenhall observed the TARGET exit the SUBJECT VEHICLE, empty handed, and walk to the main entrance of the West Haven Stash House. Once the TARGET arrived at the front entrance, he appeared to scan a keycard to enter the building. At approximately 2:54 P.M., TFO Mendenhall observed the TARGET exit the main entrance of the West Haven Stash House and enter the SUBJECT VEHICLE. TFO Mendenhall saw the TARGET depart the area headed towards Interstate 95.

19. At approximately 3:11 P.M., DEA Special Agent James Lugo observed the SUBJECT VEHICLE parked in front of a building at an address in North Haven that is known to me and that shall be referred to in this affidavit as the North Haven Stash House. The North Haven Stash House is a commercial type building with multiple units bearing unit identifiers on their doors. The SUBJECT VEHICLE was parked in front of a door marked "A1." At

approximately 3:21 P.M., Special Agent Lugo observed the SUBJECT VEHICLE depart the North Haven Stash House. The TARGET was followed to several businesses in the area of Washington Avenue in North Haven.

20. At approximately 3:40 P.M., DEA Special Agent Van Almkerk observed the TARGET park in the rear of the North Haven United States Post Office located at 74 Washington Avenue. At approximately 3:45 P.M., Special Agent Van Almkerk observed the TARGET exit the driver's seat of the SUBJECT VEHICLE. The TARGET appeared to be talking into a cell phone and walked into the rear entrance of the post office. At approximately 3:48 P.M., Special Agent MacNamara observed the TARGET exit the rear entrance of the post office carrying a box. The TARGET placed the box into the SUBJECT VEHICLE and began walking across the parking lot. The TARGET appeared to be talking into his cell phone while walking and was observed waving his hands in a demonstrative manner while speaking into his cell phone. At approximately 3:57 P.M., DEA Special Agent MacNamara observed the TARGET enter the SUBJECT VEHICLE and leave the post office. After exiting the post office parking lot, the TARGET stopped at an Exxon Gas Station across the street for a short time.

21. At approximately 4:05 P.M., TFO McGarvey observed the TARGET arrive at the North Haven Stash House and park in front of the "A1" sign. Special Agent Lugo observed GUZMAN remove several boxes from the SUBJECT VEHICLE and place them into the door next to the "A1" sign. The TARGET remained inside the unit for a short time. At approximately 4:10 P.M., Special Agent Lugo observed the TARGET walk out of "A1" and enter the SUBJECT VEHICLE. A short time later, the TARGET departed the North Haven Stash House. In anticipation of the TARGET departing "A1," case agents deployed surveillance units to the West Haven Stash House and the Milford Address.

22. At approximately 4:51 P.M., I observed the SUBJECT VEHICLE park in front of the common door for the Milford Address, specifically, the door that includes the Target Unit. At approximately 4:58 P.M., I observed the TARGET exit the residence carrying a box that appeared to be weighted. The TARGET placed the box into the SUBJECT VEHICLE and entered the driver's seat. I then observed the TARGET drive out of the apartment complex a short time later.

23. At approximately 5:03 P.M., Special Agent MacNamara observed the TARGET enter the Pilot Gas Station parking lot located at 433 Old Gate Lane in Milford and park at the gas pumps. I positioned himself directly across the street at an adjacent gas station and observed the TARGET exit the SUBJECT VEHICLE and meet with a Hispanic male, identified as Individual-1, near a blue Toyota Camry. Case agents conducted a COLLECT/NCIC check of the vehicle's registration and discovered that it was registered to Individual-1 at an address known to me in New Haven. I also recognized Individual-1 from social media posts. I observed the TARGET hand Individual-1 what appeared to be a red and white cooler. The two then shook hands and departed the area.

24. At approximately 5:29 P.M., TFO McGarvey observed the TARGET and the SUBJECT VEHICLE pull into the North Haven Stash House and park in front of "A1." Case agents observed the TARGET enter "A1" for a short time before departing the area. At approximately 5:34 P.M., surveillance was terminated.

25. Approximately two minutes later, at 5:36 P.M., the "SPITFIRE / TRAPPR KEEPRZ NEW ENGLAND" channel posted a video of a warehouse containing numerous pallets piled with stacked boxes. The post read, "4,000 Stilizy 1 Gram Pod, 8,000 Stilzy 40's, 7,000 stilizy L IIIL Dispos, 6,000 Stilizy 40's Blunt Multi, 5,000 Stilizy 2G XL Blunt, 10,000 Stilizy 1G Preroll, 8,000 Stilizy Black Flower Bag, 10,000 Stilizy Gummies." This post was

seemingly in reference to a shipment of marijuana products that "SPITFIRE / TRAPPR KEEPRZ NEW ENGLAND" had received. A recording of this post was uploaded to the case file.

26.     At approximately 5:43 P.M., "SPITFIRE / TRAPPR KEEPRZ NEW ENGLAND" posted an audio message that stated, "I gotta go through some big ass loads, I'll be listening to everything real soon guys." In the background of the aforementioned voice message, a GPS voice can be heard saying, "turn left onto Washington Avenue." Notably, that same day, the TARGET was seen traveling on Washington Avenue multiple times throughout the surveillance operation. Additionally, when the TARGET left the North Haven Stash House and began traveling on Broadway, the TARGET was observed making a left turn onto Washington Avenue multiple times. A recording of this post was uploaded to the case file.

27.     During the end of July 2023 and in early August 2023, UC1 was in contact with "SPITFIRE_CT" via the Telegram app. In sum and substance, UC1 asked "SPITFIRE_CT" if the mushrooms that he posted for sale were in Connecticut. "SPITFIRE_CT" said they were and UC1 was able to negotiate a sample price of one ounce of psilocybin mushrooms for $100 of DEA official advanced funds ("OAF"). UC1 said he could send one of his people to Connecticut to pick up the sample. UC1 asked "SPITFIRE_CT" via the Telegram app if he would be around in the afternoon of August 8, 2023. "SPITFIRE_CT" said he would be around and agreed to meet at Ikea located at 450 Sargent Drive in New Haven at 1:00 P.M.

28.     On August 8, 2023, members of the DEA NHDO, formulated a plan to conduct a controlled purchase from the TARGET. Three case agents acted in an undercover capacity. UC1 was in communication with "SPITFIRE_CT." Through Telegram messages, UC1 made arrangements with the TARGET to sell a "sample" of one ounce of psilocybin mushrooms for $100. DEA Special Agent Frank Castiglione and TFO McGarvey, both acting in an undercover

capacity and herein referred to as UC2 and UC3 respectively, acted as UC1's associates during this controlled purchase. UC1 communicated with the TARGET's Telegram account on this date and through the course of this controlled purchase.

29. Surveillance was established on known locations of the TARGET by members of the NHDO. At approximately 11:55 A.M., I observed the SUBJECT VEHICLE parked in the lot of the Milford Address at the Target Unit.

30. At approximately 1:19 P.M., I observed the TARGET walking a small dog outside his residence briefly. I observed the TARGET again as he exited the building at approximately 1:30 P.M. The TARGET appeared to be on his phone as he walked to and entered the SUBJECT VEHICLE. The SUBJECT VEHICLE exited the parking lot a few minutes later. Mobile surveillance was conducted on the SUBJECT VEHICLE as it exited the lot and was followed until it parked across the street from the West Haven Stash House at approximately 1:56 P.M. Special Agent Matthew Brouillard, who was positioned at the West Haven Stash House, observed the TARGET exit the SUBJECT VEHICLE and walk to and enter the West Haven Stash House through the front door. At approximately 1:59 P.M., Special Agent Brouillard observed the TARGET exiting the front door of the West Haven Stash House holding a brown paper bag in his hand. The TARGET then walked towards the SUBJECT VEHICLE, which he entered and departed the area in.

31. Mobile surveillance was continued on the SUBJECT VEHICLE as it left the area of the West Haven Stash House and drove directly to the IKEA parking lot at 450 Sargent Drive in New Haven, arriving at approximately 2:13 P.M. The SUBJECT VEHICLE drove a slow loop around the vehicle that UC2 and UC3 were in and then parked nearby. It should be noted that UC1 was in conversation with the TARGET via Telegram and had provided a vehicle

description of the UC2 and UC3's vehicle and a general location of where their vehicle was parked in the IKEA lot prior to the TARGET arriving.

32. UC3, who had been issued $100 of DEA OAF, exited his vehicle and walked towards the SUBJECT VEHICLE. At this same time, the TARGET exited the driver seat of the SUBJECT VEHICLE and walked towards UC3. UC3 then met with the TARGET in the parking lot between where the two vehicles were parked and handed the TARGET $100 dollars of DEA OAF. In return, the TARGET handed UC3 one small brown bag with a "Trappr Keeprz" sticker, which contained one Ziploc bag filled with gray and brown mushrooms and one Polka Dot Belgian white chocolate mushroom-laced candy bar.

33. After a brief conversation, the TARGET and UC3 separated, and the TARGET reentered the SUBJECT VEHICLE and left the parking lot. UC3 was later provided photographs of the TARGET and positively identified him as the male he met with and who was operating the SUBJECT VEHICLE on this date and time.

34. Case agents maintained mobile surveillance on the SUBJECT VEHICLE as it left the IKEA lot until it arrived back at the street of the West Haven Stash House at approximately 2:25 P.M. The TARGET was observed sitting inside the SUBJECT VEHICLE for an extended period of time. At approximately 3:20 P.M., the TARGET exited the SUBJECT VEHICLE and walked into the West Haven Stash House. Once the TARGET was inside the West Haven Stash House, surveillance was terminated.

35. Once back at the NHDO, a representative sample of the gray and brown mushrooms from inside the Ziploc bag was tested using an approved chemical reagent test. This field test produced positive results for the presence of psilocybin.

36. Case agents reviewed the conversation between UC1 and the TARGET. In sum and substance, the TARGET advised UC1 he was running late and asked what UC2 and UC3

were driving. UC1 advised the TARGET that the UC2 and UC3 were in a dark grey Toyota Highlander with Virginia plates. At 1:55 P.M., the TARGET advised UC1 that he was just arriving at his "shop" and would be providing a free mushroom bar for the wait. The TARGET stated he would be at IKEA shortly and that he was in West Haven and was only a few minutes away. While the TARGET was in conversation with the UC1 and under constant surveillance, he advised he was at the "shop" in West Haven, which case agents have identified as the West Haven Stash House and one of the potential stash locations being utilized by the TARGET. At the time of the announcement, case agents observed the TARGET at the West Haven Stash House.

### Difficulty of Maintaining Surveillance of the SUBJECT VEHICLE

37. Based on my involvement in surveillance and my personal participation in surveillance, I know that the SUBJECT VEHICLE is usually parked at the Milford Address, at the Target Unit, in Milford, Connecticut, when it is not being used. However, a tracking device is necessary because maintaining visual surveillance of the SUBJECT VEHICLE has proven difficult, especially with the TARGET's late afternoon and late evening hours of operation. Through daily observations of the Telegram account, "SPITFIRE / TRAPPR KEEPRZ NEW ENGLAND," the TARGET typically posts that the shop is open in the late afternoon and late night hours. Case agents believe we have located two stash locations, one at the West Haven Stash House and one at the North Haven Stash House, Unit 1A. Case agents have installed covert pole cameras at both locations and have observed the SUBJECT VEHICLE on numerous occasions for short periods of time. The TARGET has been seen at the North Haven Stash House location during late night hours under the cover of darkness moving large boxes and leaving in a short period of time. Once case agents established an area where the SUBJECT VEHICLE was located, the SUBJECT VEHICLE would be mobile again. During the

course of this investigation, mobile surveillance units have lost the SUBJECT VEHICLE numerous times due to the TARGET'S pattern of driving and countersurveillance tactics. Specifically, the SUBJECT VEHICLE often exhibits irregular driving patterns, such as slowing down to slow speeds way beneath the speed limit and then speeding up. The SUBJECT VEHICLE has been observed "squaring the block," that is, driving in circles and stopping at businesses for short periods of time without the TARGET exiting the SUBJECT VEHICLE. Through training and experience, I know that drug dealers typically utilize these tactics to see if they are being followed by law enforcement.

38. Furthermore, this investigation has revealed that the TARGET uses the SUBJECT VEHICLE to accomplish his illegal activities. The GPS tracking of the SUBJECT VEHICLE will allow agents to identify the TARGET'S co-conspirators as well as locations where the TARGET and his associates obtain narcotics, store narcotics, sell narcotics, and store proceeds from the sale of narcotics. The use of mobile surveillance and covert pole cameras is not sufficient to accomplish this goal with the TARGET's countersurveillance and late hour posts when he typically does his drug dealing. Moreover, as described above, the TARGET's frequent trips during the overnight hours and the difficulty in maintaining surveillance because of his driving tactics makes it impossible for case agents to perform traditional surveillance safely and without being detected.

39. Based on my own observations and the observations of law enforcement agents familiar with this investigation, I know that the SUBJECT VEHICLE is presently within the District of Connecticut. In order to track the movement of the SUBJECT VEHICLE effectively and to decrease the chance of detection, I seek authorization to place a tracking device on the SUBJECT VEHICLE while it is in the District of Connecticut. Because the TARGET sometimes parks the SUBJECT VEHICLE in driveways and on other private property,

it may be necessary to enter onto private property and/or move the SUBJECT VEHICLE to effect the installation, repair, replacement, and removal of the tracking device. As described above, I and other agents have frequently observed the SUBJECT VEHICLE parked at the TARGET's residence at the Milford Address near the Target Unit.

40. To ensure the safety of the executing officer(s) and to avoid premature disclosure of the investigation, I request that the court authorize installation, maintenance, and removal of the tracking device during both daytime and nighttime hours. The Milford Address is a complex housing many individuals, and requiring installation of the tracking device on the SUBJECT VEHICLE during daytime hours would carry with it a significant risk that the executing officer(s) will be seen by someone living at, or coming or going from, the Milford Address.

41. In the event the Court grants this application, there will be periodic monitoring of the tracking device during both daytime and nighttime hours for a period not to exceed 45 days following issuance of the warrant. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

## AUTHORIZATION REQUEST

42. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that authorizes members of DEA or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install a tracking device on the SUBJECT VEHICLE within the District of Connecticut within 10 days of the issuance of the proposed warrant, to maintain, repair, and/or replace the tracking device as necessary, and to remove the tracking device from the SUBJECT VEHICLE after the use of the tracking device has ended; to install, maintain, and remove the tracking

device during both daytime and nighttime hours; to surreptitiously enter onto the exterior premises or common parking lot of the Milford Address in Connecticut; and to monitor the tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private garages and other locations not open to the public or visual surveillance, both within and outside the District of Connecticut.

43. In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrant authorize delayed notification of the execution of the warrant for 30 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

Respectfully submitted,

KYLE SAVO (Affiliate)
Digitally signed by KYLE SAVO (Affiliate)
Date: 2023.08.16 10:16:41 -04'00'

Kyle A. Savo
Task Force Officer
Drug Enforcement Administration

The truth of the foregoing affidavit has been attested to me by Task Force Officer Kyle A. Savo over the telephone on August 16, 2023 .

Maria E. Garcia
Digitally signed by Maria E. Garcia
Date: 2023.08.16 17:05:54 -04'00'

HONORABLE MARIA E. GARCIA
United States Magistrate Judge